IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 16-00056-CG-C |
| | ) | |
| TELESFORO LOZANO | ) | |
| | ) | |
| | ) | |

## ORDER

This matter is before the Court on Defendant's motion to suppress (Doc. 13), and the United States' response (Doc. 16). For the reasons stated herein, Defendant's motion to suppress will be denied.

I.   BACKGROUND

The following facts were established at the suppression hearing held in this matter on May 10, 2016:

On August 23, 2015, at around 12:25 p.m., Trooper William Barnes initiated a traffic stop of a black 2002 Ford F150 Harley Davidson Edition truck with a Chihuahua Mexico license plate driving East on I-10 in Mobile Alabama. Barnes had been traveling behind the truck and observed it weaving and crossing over the fog line. Another officer, Trooper Jeremiah Headley, stopped behind Barnes and assisted in the traffic stop. Barnes approached the passenger side of the truck and noticed that the truck was very clean on the outside, but was dirty on the inside. Barnes questioned the driver, Defendant Telesforo Lozano, who speaks Spanish and did not appear to understand English. The Defendant was sweating profusely.

Barnes attempted to use some Spanish, but Barnes does not know much Spanish. Defendant gave Barnes his license, a border crossing card, and a registration for the vehicle. The drivers license was issued from the state of Coahuila, Mexico, but the vehicle had just been registered five days ago, on August 18, 2015, in the state of Chihuahua, Mexico. Defendant presented an insurance card that had been issued just two days prior, on August 21, 2015, from the Defendant's home state, Coahuila. In the back seat of the truck, there was a tow bar that could be used to tow a car along with a toolbox and a jack. However, the Defendant's truck did not have a hitch or ball on the back to which the tow bar could attach. Barnes attempted to question the Defendant about what he was doing and the Defendant offered that he was going to Atlanta. Muddled conversation was held between the Defendant and Barnes from which Barnes concluded the Defendant might have said he was going to Atlanta to buy a car, but because of the language barrier, he could not be sure. Barnes asked him if he had money to pay for the car and the Defendant opened his wallet to show Barnes his money, but Barnes said there was not very much money in his wallet. The Defendant did not appear to have enough money to purchase a car.

  Barnes called a friend, Lieutenant Danny Martinez, who works as a Trooper in South Texas and is fluent in Spanish, to help him communicate with the Defendant. Barnes told Martinez what he thought the Defendant had said and asked Martinez to question the Defendant. Martinez talked to the Defendant via speakerphone and relayed the Defendant's answers to Barnes. Martinez said the

Defendant did report that he was going to Atlanta to buy a car, but that he did not know what kind of car, how much it would cost or where he was to pick it up. The Defendant was to contact someone for the details when he got to Atlanta, but he could not come up with the phone number of his contact. Martinez and Barnes reported that going to Atlanta to buy a car was a common story they hear a lot, that is often legitimate, but is also easily exploited. Both Martinez and Barnes reported that the Defendant seemed nervous. Barnes also noticed there was a drywall screw in the windshield cowling. It was obviously a non-factory screw indicating tampering in an area allowing access too the firewall which is between the interior of the car and the engine. According to Barnes, the firewall compartment is the number one place for concealment of drugs and you can get to it by removing the cowling around the windshield. Barnes believed the screw to be evidence of tampering and told Martinez that the firewall was "all jacked up." Martinez told Barnes that he thought he should not let the Defendant go[1].

      Barnes also called another officer, Trooper William Pullins, who has a canine used for drug sniffing, to come out to the scene. Pullins arrived and waited for Barnes to tell him they needed him. Barnes called Martinez and texted him a picture of the Defendant's registration because Barnes had trouble discerning the information because it was in Spanish. Barnes first thought the registration was

---

[1] Martinez testified that based upon the defendant's story and the registration of the truck being very recent and in a state different than the defendant's residence, he believed it to be a "throw down" vehicle: one which the cartels provide to an individual for transporting drugs. The cartels provide cheap vehicles which the transporter can keep if he makes it back to Mexico with the vehicle after the journey.

3

expired, but the date he was looking at was actually the date of issue, not the expiration date. Martinez helped Barnes understand the information on the registration and Barnes used the information to fill out the warning he was preparing for the Defendant.

Barnes gave the Defendant a warning for improper lane usage and gave him back all of his documents, but then proceeded to ask the Defendant more questions.[2] It took about 28 minutes from the time Barnes started to pull the Defendant over until the time he issued the warning and gave the Defendant back all of his documents. Barnes asked him to confirm again whether the vehicle was his and then asked him if he would consent to have his vehicle searched. The Defendant appeared to consent, but Barnes handed him a consent form to sign that was in Spanish and told him to read it and sign if he consented. The Defendant looked at the form, but seemed confused. The Defendant asked Barnes something in Spanish and Barnes decided he needed to get Martinez back on the phone to explain the consent form to the Defendant. Martinez again spoke with the Defendant and advised him he was free to deny consent. The Defendant, after talking with Martinez, decided not to give consent for the search. Barnes then called Trooper Pullins, who was waiting in his car, to have his canine check the vehicle. The

---

[2] When Barnes gave Defendant back his documents, defense counsel contends Barnes told the Defendant he was free to go or at least that there were hand motions used that indicated the Defendant could go. But Barnes denied telling the Defendant he could go and, after reviewing the video from the trooper's dash camera, the Court concludes that Barnes never told the Defendant he could go. There was clearly some miscommunication going on between the two of them and it is possible the Defendant believed he was free to go for a second, but Barnes does not appear to say or indicate that the Defendant is free to go.

canine gave a positive alert near the area where Barnes had noticed the odd screw in the windshield cowling.  Barnes then told the Defendant that the dog had alerted and that they were going to search the vehicle.

Barnes popped the hood of the car and saw that the engine had been wiped down clean and there was fresh paint.  Barnes then had the vehicle taken back to the trooper headquarters because he knew there was a good chance he would render the vehicle disabled if he proceeded to take it apart to search for drugs.  Packages containing 4.8 kilograms of a substance that tested positive for cocaine were reportedly found in the engine of the Defendant's vehicle and Defendant was charged with violating 21 U.S.C. § 841(a)(1).

**II.   ANALYSIS**

The issue is whether the prolonged detention of Defendant and investigation by Trooper Barnes into matters unrelated to the initial traffic stop are supported by reasonable suspicion.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Under the exclusionary rule, evidence derived from a search that violates the Fourth Amendment cannot be used in a criminal trial against the victim of the illegal search and seizure.  United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003).

In a recent opinion, the United States Supreme Court re-stated the relevant law and expanded on the matter at issue:

5

> A seizure for a traffic violation justifies a police investigation of that violation. "[A] relatively brief encounter", a routine traffic stop is "more analogous to a so-called 'Terry stop' . . . than a formal arrest." Knowles v. Iowa, 525 U.S. 113, 117 (1998) (quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984), in turn citing Terry v. Ohio, 392 U.S. 1 (1968)). See also Arizona v. Johnson, 555 U.S. 323, 330 (2009). Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, Caballes, 543 U.S., at 407, and attend to related safety concerns, infra, at 6–7. See also United States v. Sharpe, 470 U.S. 675, 685 (1985); Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." Ibid. See also Caballes, 543 U.S., at 407. Authority for the seizure thus ends when tasks tied to the traffic infraction are–or reasonably should have been–completed. See Sharpe, 470 U.S., at 686 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").
>
> * * * *
>
> The seizure remains lawful only "so long as [unrelated] inquires do not measurably extend the duration of the stop." 555 U.S., at 333. . . . An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . [an officer] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

Rodriguez v. United States, 575 U.S. ___, 135 S. Ct. 1609, 1614–615 (2015). Thus, absent articulable reasonable suspicion of criminal activity, detention beyond what is necessary to complete the traffic stop is unconstitutional. Id. at 1616.

In determining whether reasonable suspicion exits, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 271 (2002) (internal citation omitted); United States v.

6

Cortez, 449 U.S. 411, 417 (1981).  "It is clear that an inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity."  United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (internal citations and quotations omitted).  "Like the determination of probable cause discussed in Illinois v. Gates, the relevant inquiry in evaluating the presence of reasonable suspicion is '"not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts."'  United States v. Tapia, 912 F.2d 1367, 1370–371 (11th Cir. 1990) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)).  Objectively reasonable suspicion of illegal activity is justified under circumstances such as no proof of ownership of the vehicle, no proof of authority to operate the vehicle, and inconsistent statements about the destination.  United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999). Furthermore, nervous behavior coupled with additional factors can form the basis of reasonable suspicion that criminal activity is afoot.  See, e.g., United States v. Sims, 385 F.3d 1347, 1354–355 (11th Cir. 2004) (finding reasonable suspicion based on nervous conduct, a prior history of drugs, and a questionable story about the defendant's travel plans); United States v. Payne, 2008 WL 4671778, at *3 (M.D. Ala. Oct. 21, 2008) (finding reasonable suspicion where the defendant exhibited a nervous demeanor, the officer smelled marijuana emanating from the vehicle, and observed "blunt powder" in the car).

In the instant case, Trooper Barnes lawfully conducted a routine stop of Defendant's vehicle.  Defendant complied with the stop and provided his license, a

border crossing card, and a registration for the vehicle. However, it was suspicious that the drivers license was issued from Coahuila, but the vehicle had just been registered five days ago, on August 18, 2015, in Chihuahua, Mexico. His insurance card had also been issued just two days prior, which Barnes thought was suspicious. The Defendant's story about where he was going and what he was doing was also suspicious since he did not know what kind of car he was going to pick up, where in Atlanta he was going to pick it up from, or how much it would cost. The Defendant also had a tow bar, but the Defendant's truck did not have a hitch or ball on the back to which the tow bar could attach. The drywall screw in the windshield cowling was also evidence that the car had been tampered with and that contraband may have been hidden inside the vehicle. In addition, the Defendant was sweating profusely and seemed nervous. Martinez agreed that it seemed suspicious and he thought Barnes should check further. Moreover, the truck was coming from Mexico, a drug source area, and purportedly going to Atlanta, a drug hub area.

      Although the time it took Barnes to conduct the initial stop was longer than a traffic stop might normally take, the length of the stop was reasonable given that the Defendant and Barnes could not understand each other. Because of the language barrier Barnes could not obtain even the basic information he needed to fill out the warning citation without calling and talking to someone fluent in Spanish. Trying to converse with the Defendant and ultimately calling Martinez to relay information between the Defendant and Barnes took considerable time. The time from the initial stop until Defendant was given back his documents lasted only

so long as was necessary to address the infraction that was the purpose of the stop.

Under the circumstances, the court finds that the subsequent questioning and prolonged detention was justified by reasonable suspicion formed during the initial stop, before Trooper Barnes returned the Defendant's documentation.  The totality of the circumstances demonstrate that Trooper Barnes had a particularized and objective basis for suspecting legal wrongdoing prior to completing the tasks tied to the traffic infraction. And once the drug dog alerted to the vehicle, the reasonable suspicion flowered into probable cause.  United States v. Tamari, 454 F.3d 1259, 1264-1265 (11th Cir. 2006).

## III.   CONCLUSION

Based on the foregoing, Defendant's motion to suppress (Doc. 13) is **DENIED.**

**DONE and ORDERED** this 12th day of May, 2016.


/s/  Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE